548 So.2d 273 (1989)
William Joseph PENTON, Appellant,
v.
STATE of Florida, Appellee.
No. 88-2821.
District Court of Appeal of Florida, First District.
August 22, 1989.
Michael E. Allen, Public Defender; and P. Douglas Brinkmeyer, Asst. Public Defender, for appellant.
Robert A. Butterworth, Atty. Gen., and A.E. Pooser, IV, Asst. Atty. Gen., for appellee.
ERVIN, Judge.
William Joseph Penton appeals from his conviction for manslaughter and the sentence imposed therefor.[1] He contends that the evidence presented at trial on the issue of causation was insufficient to support the conviction and that the trial court therefore erred in denying his motion for judgment of acquittal. We agree and reverse with directions that he be discharged as to such offense.
Appellant and a codefendant burglarized the garage of Michael D. Scott (decedent), stealing therefrom two bicycles. Scott, who was alerted to the burglary by barking dogs, and his son's shouts that someone was stealing his bike, ran from the house, chasing appellant, who was seen riding away on one of the two bikes. After chasing appellant approximately 25 to 30 feet, Scott fell down in the middle of the street. Attempts to revive him failed and he was dead at the scene. Appellant was thereafter charged with first degree premeditated murder or felony murder, burglary and theft.
At the trial, Dr. Charles Fenner McConnell, the pathologist who performed the *274 autopsy on the victim, offered his opinion as to the cause of Scott's death. He stated the case was complex, because the victim did not have any one condition that he could say within reasonable medical certainty was the cause of the death. He did state, however, that the victim's only abnormality was an enormously large liver, which was caused by an amount of fat that had collected inside it. He testified that it is well documented that people with such a condition can die suddenly and that death can be caused when the fat emboli are released into the blood stream and block the flow of blood through the lungs and other organs. He confirmed that the victim had a fatty liver, and it was logical to him that the sudden exertion could have exacerbated the condition, causing the release of the fat emboli, resulting in Scott's death. Although the doctor admitted that people with this condition can die suddenly without exertion, he believed that there was a very strong relationship between the exertion and the death. He did not, however, perform a fat stain of the victim's lungs to prove conclusively the presence of fat emboli.
Following the close of the state's case, appellant moved for judgment of acquittal. The state stipulated that it would not proceed on the premeditated murder charge, and the court denied appellant's motion as it related to the felony murder offense. Thereafter the jury was instructed, in connection with the homicide charge, as to the offenses of first degree felony murder, second degree felony murder, murder in the second degree, manslaughter, battery, assault and excusable homicide. The jury returned a verdict finding appellant guilty of the lesser offense of manslaughter. Judgment was entered thereon and appellant was sentenced to 15 years.
The offense for which appellant was convicted, manslaughter, is defined as "[t]he killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification ... and in cases in which such killing shall not be excusable homicide or murder... ." § 782.07, Fla. Stat. (1987). Manslaughter requires an element of causation. See Fla. Std.Jury Instr. (Crim.) at p. 68; Cunningham v. State, 385 So.2d 721, 722 (Fla. 3d DCA 1980), review denied, 402 So.2d 613 (1981) (the two affirmative elements of manslaughter being: (1) the killing, and (2) a causative link between the death and the act, procurement or culpable negligence of the defendant); Tegethoff v. State, 220 So.2d 399, 402 (Fla. 4th DCA 1969) (to uphold manslaughter conviction, causation must be established).
It is axiomatic that the state has the burden of proving each of the various elements of the offense, and that it must, in order to avoid the entry of a judgment of acquittal, produce legally sufficient evidence of each element. 1 W. LaFave & A. Scott, Substantive Criminal Law § 1.8(b), at 68 (1986). It is the state's position that the pathologist's expert testimony is sufficient to establish causation, based upon the following language in Buenoano v. State, 527 So.2d 194, 197-98 (Fla. 1988): "Expert medical testimony as to the cause of death need not be stated with reasonable certainty in a homicide prosecution and is competent if the expert can show that, in his opinion, the occurrence could cause death or that the occurrence might have or probably did cause death." See also Brate v. State, 469 So.2d 790, 793-94 (Fla. 2d DCA), review denied, 479 So.2d 117 (1985), recognizing that expert testimony as to the mere possibility of causal relation between the act and death is generally insufficient; however, medical testimony as to the likelihood or probability of a causal connection between the defendant's act and the victim's death is generally sufficient to establish causation.
We cannot agree that the evidence presented in this case was legally sufficient to establish that appellant's actions caused the victim's death. In so saying, we note both the equivocal nature of the doctor's testimony,[2] as well as case law from other *275 jurisdictions recognizing that in order to find a defendant criminally responsible for the death of a person caused by the release of fat emboli, the evidence must show that the defendant actually performed some affirmative act that caused the fat emboli of the victim to be released. See White v. State, 373 So.2d 356 (Ala. Crim. App. 1979) (defendant repeatedly struck victim with a stick on areas of body where a lot of fat tissue was located (buttocks, thighs and arms), causing the release of the fat cells into the blood stream); Gale v. State, 747 S.W.2d 564 (Tex. Ct. App. 1988) (defendant put victim in scalding water, causing fat to melt in victim's legs and resulting in fat emboli entering the blood stream); Neal v. State, 374 S.W.2d 668 (Tex. Ct. App. 1964) (defendants struck victim, fracturing jaw and ribs, and causing release of fat emboli into blood stream).
Criminal responsibility for manslaughter should be determined by considering the act that resulted in the death from all of the surrounding circumstances, and not from considering the result alone. See, e.g., Tipton v. State, 97 So.2d 277, 281 (Fla. 1957) (nonforceful, but "rude" pushes of deceased by defendant did not amount to reckless disregard of human life or of deceased's safety); Dominique v. State, 435 So.2d 974 (Fla. 3d DCA 1983) (manslaughter conviction reversed upon showing that the victim was accidentally shot while defendant, whose life had been threatened, was retrieving loaded gun from the glove compartment of his car); Walsingham v. State, 272 So.2d 215 (Fla. 2d DCA 1973) (evidence disclosing that defendant had admonished his children to stay in the living room while he went into the bedroom to examine his newly acquired rifle, which then accidentally discharged, resulting in a bullet passing through the door, and striking and killing his son, was insufficient to support manslaughter conviction); Getsie v. State, 193 So.2d 679 (Fla. 4th DCA 1966), cert. denied, 201 So.2d 464 (1967) (evidence consisting of defendant's testimony that he was slowly releasing hammer of his gun when it was about a foot and a half away from his wife, and that he had just begun to sit down on her lap, when the gun, which he knew was loaded, discharged, fatally injuring his wife, did not support manslaughter conviction). Cf. Tuff v. State, 509 So.2d 953 (Fla. 4th DCA 1987) (although reversed because of prosecutorial misconduct during closing argument, evidence that defendant had ongoing argument with victim, resulting in shoving match prior to the discharge of the gun, tended to support manslaughter conviction).
Because the consequences of a determination of guilt in a criminal case are far more severe than the consequences suffered by a defendant in a tort action, we conclude that a closer relationship between the result effected and that intended or hazarded is required. See 1 W. LaFave & A. Scott, Substantive Criminal Law § 3.12(c) (1986).
We therefore conclude that the evidence on the issue of causation is legally insufficient to convict appellant of the lesser offense of manslaughter, and reverse the conviction with directions that appellant be discharged as to such offense.
SHIVERS, C.J., concurs.
JOANOS, J., dissents without written opinion.
NOTES
[1] Appellant was also convicted of one count each of burglary of a dwelling and petit theft; however, he does not seek review of these convictions.
[2] When asked for his expert opinion, based upon reasonable medical certainty, as to the cause of death, Dr. McConnell replied, "Well, this is a rather complex problem, because Mr. Scott did not have something that I could point to and said [sic] that is absolutely the cause of death." In reply to the question of what caused Scott to die, the doctor stated, "Well, he had a fatty liver." When questioned regarding his expert opinion, within a reasonable degree of medical certainty, as to whether Scott's death would have occurred at that time either with or without the running, the doctor said, "Well, it is true that people with fatty liver can die without exertion. There is no question about that. But the relationship in this case to the exercise is certainly to me a very strong relationship." Dr. McConnell also made the following statements: "We have very good scientific evidence that the cause of death in this man was his fatty liver. Now, how that fatty liver related to his immediate demise and what relationship the exercise had in it has to do with the mechanism of death, and that  that is where my testimony was not as strong as it was with the fatty [sic], because there is no absolute scientific rule that I have to follow on what  how much exercise would induce how much fat...."